Case number 24-1743. Alexander Ansari v. Moises Jimenez. Oral argument not to exceed 15 minutes per side. Ms. Masseron, you may proceed for the appellant. May it please the court, Mary Masseron on behalf of the defendant appellant, I'd like to reserve four minutes for rebuttal. You may. A reversal is required here based on hack because Ansari deliberately circumvented and flouted both state and federal requirements for setting aside a conviction after a jury trial and the state court proceedings that led to the judgment. This court now has a chance to put a stop to the gamesmanship seen in this improperly entered stipulated order between two former SATO attorneys now staffing the Wayne County Prosecutor's Office of Conviction Integrity and two federal defenders not licensed by the Michigan Bar and not appointed by any state court to represent Ansari and neither of whom entered an appearance for him in state court. And the lack of this precondition for a section 1983 suit that calls the state jury verdict and judgment of conviction into question should end the matter. If the court goes to any of the other issues, a reversal is required because no clearly established law would have told Jimenez that the information Ansari claims he failed to disclose fell within Brady Giglio and its mandatory disclosure obligations. It was as incriminating as exculpatory as the district court recognized in its initial decision. And much of it was not admissible because it was tenuous and speculative and unconnected with the crime for which Ansari was tried. And finally, Ansari's lawyer knew about Sandoval and his connection to the two surviving victims and chose not to pursue that in the state criminal trial. And finally, the trial was prejudicially flawed on multiple grounds, which made it impossible for the trial in this case to fairly adjudicate Jimenez's liability for the constitutional claims that Ansari brought. I'd like to ask you, Miss Masseron, about your heck claim, which seems to be your primary argument. So, heck, the point of heck seems to be to avoid conflicting resolutions between state courts and federal courts. Mr. Jimenez has been released from prison since 2019. We have a state court order and judgment saying that all charges against him are dismissed and the sentence is vacated. So if we were to grant, if we were to agree with you and say, oh, no, none of that was valid, wouldn't we be turning heck on its head? In other words, we would be creating the conflict between state court and federal court judgments. I thought the point of heck was to just defer to what the state courts have done. Once that's done, then we move on. That seems to be your primary stumbling block. So I want to let you talk about it. I don't believe that that is the case, and here's the reason why. There is a discussion, I believe it was in one of the footnotes in heck, in which the dissent or one of the parties argued, well, this rule about you have to overturn your conviction, you have to get it expunged or reversed or so forth, this is going to be a really bad rule because what if you've been served your time, you're out of jail, you no longer have any of those remedies available? And this court said, no, that's not a problem. Those people won't have their 1983 claim because we, the federal courts, don't want to be in the business of being the first court to look at that criminal trial and opine about whether that criminal trial was or was not constitutionally sufficient. And that's true here. We have an order that was entered in state court that does not have any findings of fact, has no facts at all, and even the conclusions does not include actual innocence. That order, after that order was entered, lawyers went to the federal court, told the federal court incorrectly that a motion had been filed when no motion was ever filed, and told the federal court that the order of the state court was to release, I'm sorry, based on actual innocence, which wasn't even in the state court order. That's just a violation of everything the courts are supposed to be doing. But wasn't the place to litigate that claim during the habeas proceeding? So in other words, if they come to the federal habeas court and they say, dismiss this claim because it's moot, and the state doesn't think it's moot, the state says, well, no, wait, that wasn't the right, I mean, that's the place to litigate that claim. The habeas order was entered also, as I understand it, by stipulation, and the record was thereafter sealed. And I understand your client probably wouldn't have had any standing to enter any kind of appearance in the habeas action. And was not a party to the state court proceedings. But you wouldn't have been a party, I understood that argument, but in a properly filed 6500 motion in state court, your client wouldn't have been a party either. So if they had properly filed a 6500, and the judge had gone through it, and the judge said, yes, he's actually innocent, then your client wouldn't have been a party anyway, and you'd just have to accept that and we'd be here. Right, we would be arguing about the other two points. That's correct. But because of the anomalous nature, but this is not the only such case, it seems to me what Hecks says, as a matter of federal law, is we are not going to use 1983 to second guess and challenge convictions unless and until there are these kinds of findings that would result in a reversal or a habeas judgment. Well, does it say that there needs to be substantive findings? Or is it just that there needs to be an order by a state court? It doesn't just say that. I'm sorry, I didn't- Yeah, would we look behind the state court judgment if they had erred? Let's say they wildly erred on substantive grounds. So Mr. Ansari files a 6500 in state court, and the state court just enters an order that is just crazy, like just wildly wrong on the law, and says, okay, I'm going to grant you 6500 relief, and the Michigan Court of Appeals just either rubber stamps it or denies leave or whatever. Michigan Supreme Court doesn't look at it. And now we're here, and you're like, but that was crazy, and we all agree. We all say, like, wow, that state court really screwed up, and if this were a habeas petition, maybe we'd even grant EDPA relief. But not in the 1980s. I mean, would you be stuck? If there had been the state court proceedings following the proper rule, I think I would be stuck. But what's different here, and Heck uses this language. First of all, it talks about a valid order. It talks about reversed, expunged, and so forth. That language is in there. It doesn't just say any order. And when you think about that, and then you look at what both the habeas statute, I've never done criminal law, but I've been reading the habeas statute and also these rules of the Michigan court, and they both are intended to do the same thing. They're intended to make sure a court is looking at, could this have been raised in the original trial? What are the new facts? Is there a new law? If you didn't raise these facts, could you have before, because of the very important values of finality and of comedy between the state and federal courts when you get to the habeas? There's no problem with comedy from your position. I think, I'm not sure I entirely understood exactly the question. There's a final order. There is a final order. And you're suggesting that the federal court should look at that and say, nope, that doesn't suit as far as the federal courts are concerned. Correct. So there's no comedy problem there? There's no federalism implication there? Well, I wouldn't go so far as to say there's no federalism implication, but I would say that because the elements of 1983 and what you have to show as a precondition or to show the claim are matters of federal law, in this circumstance where HECC has required parties before they challenge a conviction to have one of the proceedings, either the state court proceedings or federal habeas proceedings, that would evaluate the conviction with findings and so forth. It's within this court's power, and I would urge it's an appropriate remedy given these outrageous circumstances to say that the element of showing that your conviction has been reversed, expunged, or set aside by a valid order has not been satisfied. But his conviction has been set aside, right? Aside from how much reasoning was given or not, he's no longer convicted, right? He's been released. Well, he has been released. Of course, the mere fact of release. But the charges were dismissed. The state court's order dismissed those charges. Correct. And so you're saying that we should say that that's not a valid order. Correct. And we talked about ultraviolence as well. What is the power of the state court, the rules under state law? I'm seeing that my red button is on, and I haven't even reached the other issues. Why don't you wrap up quickly unless my colleagues have questions? The rules under state law empower and limit setting aside a conviction to written findings of fact and conclusions of law, none of which have been provided to this court to show, hey, it's okay, we can go on to 1983. And the reason is because they don't exist. All right. Thank you. We'll hear what else you have to say on rebuttal. Thank you. Good morning. May it please the Court, Beth Whitman appearing on behalf of the plaintiff, Mr. Ansari. I believe your Honor's questions regarding Heck, I think this Court's very aware of the issues, of the arguments. I would just point out, though, that the court rules do, in fact, provide discretion. They provide some leniency in 6.502D. It allows a state court to adjudicate even a nonconforming request for relief that's not submitted in the manner in which it's indicated in the court rule. So if that's the case, then I think that's exactly what the trial court did here. And I think that order should be given, obviously, complete deference by this court. Is this standard practice with the Wayne County Conviction Integrity Unit? Is that sort of how they're proceeding? Like, so they do their investigation, they issue a report. Obviously, they're an arm of the prosecutor's office, and the defendants are never going to say, this is a bad deal for me. And so they just go into court and get a stipulated order. This is just ordinary proceedings. I have, I think, maybe four or five cases. This is exactly what has happened in every single one of those cases. This is exactly the same argument that's made in every single one of those cases as well. So I think to the extent that this is – Wait, you're saying that other cases have raised the question of whether a properly filed 6500 motion is essential for 1983 jurisdiction? Yeah, the heck issue is raised in every single one of them. Are there other cases that this court has seen? There are other cases. I have to – I'll think of it in just a second. It's Chorney, and then I believe also Salter dealt with it as well. Both of those cases, however, were on an interlocutory basis, so the court held that there was, in fact, no jurisdiction to review that issue. So this is, to my knowledge, one of the first cases that this has come to the court after a final judgment that's been answered. I just wanted to make sure I – No, absolutely. But this issue, this argument is raised, at least from what I have seen, in every single one of these cases. And every single one of the cases as well has been rejected by the district court. So then I did have just a couple points. I know that sister counsel didn't have a chance to address some of the really specific issues. There were a couple things that came up in the reply brief, though, that I just wanted to quickly touch on. Mr. Ansari – actually, Ms. Masseron did indicate this – that Mr. Ansari's attorney actually knew of this drug evidence, this drug connection between Ms. Barley and Mr. – I think it's pronounced Figueroa – that he was aware of this and didn't bring this up. He did provide testimony in this case where he did say, in fact, he did not have this information. And that's consistent with the prosecutor's testimony as well, Ms. Toussart. She said she was not made aware of this information either until after Mr. Ansari's conviction. So the testimony from the criminal defense attorney is from the February 12, 2024, transcript on pages 113 to 116 and 120 to 122. So I think that is definitely something that there is testimony that conflicts with that statement. Also, there's a statement in the reply brief that there was this tip that said that Solo was the shooter. And the defendant makes an argument in the reply brief that Mr. Ansari was Solo, and that's not true. He was actually identified by Mr. Jimenez as Sousa. There was another tip that came in. That's what led Mr. Jimenez to actually point to Mr. Ansari because he went back to the precinct and asked some questions, and Sousa was apparently a nickname. Okay, so let's stop for a minute because I thought that everybody agreed that Ansari's nickname was Solo, and that the tip was Solo did it, but there was also a description of Solo that didn't match Ansari because it described him as being overweight. Oh, I think the Sousa one is what led to that. Okay, so clear me up on Sousa and Solo, please. There were two different tips, one with Sousa, one with Solo. Mr. Jimenez testified that he went back and he asked who Sousa, and people indicated that it would be Mr. Ansari, but it didn't match the description in the Sousa tip. I think it was indicating that the person had a beard, but it was also Hispanic, which Mr. Ansari is not. Then there's the separate tip about Solo. I could be mistaken, but I didn't see anything that indicated that Mr. Ansari was ever known by Solo. So these are two different issues. Thank you. I'm just curious. Is your client, Ansari, was he himself a drug dealer or drug user? I don't know. I think there was maybe some evidence that he was maybe kind of a small potatoes maybe kind of dealer perhaps, but certainly not to the level of Mr. Sandoval, who everybody knew was like a big drug kingpin in the area, had connections with Mexican drug cartels. That was part of what the exculpatory evidence was is that there was no connection as shown between the communications that they recovered from Sandoval's phone, that there was no connection between them. The eyewitness identification by the two surviving Barley wasn't just that he was a Boy Scout who just happened to look like the sketch. Sure. He had some little tangential involvement with drugs himself. And I think he was somebody who was in the neighborhood. Even one of the other witnesses who saw the shooter run down the alleyway said, yes, I know him, I see him in the neighborhood, but that was not him. That was not the shooter. I know who this guy is. He's not the one. He's not big enough, essentially. He wasn't the right size. He wasn't the 300-pound running.  Yes. So I have so much time. I'd be happy to answer any questions. Why don't you talk about this Brady claim? Yes. So on the Brady claim, Ms. Masseron's point seems to be that we don't have clearly established Supreme Court case law that would tell us that this kind of evidence would qualify as Brady evidence, that it would qualify as exculpatory material, and that that is something that we need. So do you want to talk about that? Sure, absolutely. So I know it's their position that it has to be something from the Supreme Court, but the Supreme Court has also said if you have authority from your own circuit, then that is going to be sufficient, and that's exactly what we have here. We have the Maldwan decision. Okay, so we do have Maldwan. It tells us that police officers have a Brady duty.  But what I understand, and yes, you're right, Ms. Masseron makes all these points, that it has to come from the Supreme Court, that maybe the police officers don't have the duty, but she also makes the point that maybe we need specificity to drill down on whether this particular kind of evidence, this would count as exculpatory in material. So in clearly established law, the Supreme Court often tells us we have to look for granularity, and I think Ms. Masseron's point is that principle should also apply here. And she says we don't have that kind of granularity. So I'm asking two questions. One, do we have that kind of granularity? And two, do we need that kind of granularity? My best answer I can give you is that I think it's already clear because Mr. Jimenez admitted over and over again that this evidence that wasn't turned over was in fact exculpatory, it was relevant to impeachment, and that it needed to be turned over. So because of that, and the prosecutor as well said this evidence absolutely needed to be turned over. It was relevant because it destroyed my, or it created a motive as to why this shooting actually occurred, and it destroyed my theory in the case that this was just some sort of random act. So you look at- Well, so, I mean, I wonder about that answer, because let's say we were in an excessive force case, which is an area where the Supreme Court says you have to be very granular. And what if the police officer said, yeah, I used my little finger to tap him on the shoulder, and yeah, that was excessive force. And everybody would say, like, obviously that wasn't excessive, and there's no Supreme Court case that would say that was excessive, but the witness on the stand got flustered and he said, yeah, I guess that was excessive. I don't think we'd have to take the officer's word for that. We would need a case from the Supreme Court saying it's excessive. And I think my point with respect to the prosecutor is that the case law, the Sykes case, does say that where the prosecutor admits that the evidence would have had to have been turned over, that implicitly recognizes that that evidence is, in fact, Brady evidence that needs to be turned over. I see. So you're saying our precedent says that with respect to Brady. That's correct. Okay. Yeah, I understand. So that's-I think everybody's testimony is pretty consistent, too, which I think helps with respect. You know, not just the prosecutor is saying that it needed to be turned over, but the defendant himself admits that it needed to be turned over, that there was nothing-that it was relevant material, all of those things that it needed to be. I'm just curious. You've got a, what, $10 million judgment at this point? Yes, that is correct. But it's only collectible against him and as? I don't know the collectibility issue. I don't know. I don't have any information that I can help you with on that one. The city was dismissed, right? The city was dismissed, yes. But even though they're dismissed, I don't know what obligations they have for payment of a judgment that is entered against somebody that they employ. And that's another point that I want to make as well. You know, they had actually-the police department had actually looked into bringing charges against Jimenez as a result of his actions in this case. You know, he had indicated, I didn't go after Sandoval because I was worried that my family was going to be targeted by the Mexican drug cartel. So they actually looked into whether or not they were going to bring obstruction charges against him. He ultimately retired and they found that that was moot. But, you know, this was serious. This was something that everybody in the department considered to be very, very, very serious. This is almost like a TV drama case. That's exactly it. They even have the two eyewitnesses falsely identify him because they had their own motives of not wanting to expose that they had cheated Sandoval out of the drugs. Exactly. This sounds crazy. This was a designed hit on them because they had stolen heroin and they testified at my client's trial that we have no idea why this happened to us. This is, you know, this was completely random. And it resulted, unfortunately, you know, horrifyingly, in the death of her sister.  And your client spent, what, five years roughly? Oh, I think it was more than that. I think it was a long time. Wasn't it 2012 when all this took place? Yeah. Released in 2019. 2019, okay. Seven years maybe, yeah. Okay, well, facts are stranger than fiction. I know. And obviously, I think, not just based upon Maldwan, we also have multiple decisions that have come out, I think, just within the last year. We have the Salter decision. We have the Clark decision. All of those decisions talk about Brady, the exculpatory evidence that needs to be turned over. So I know that this is a very, you know, difficult issue, but I think it's one that, you know, this circuit certainly has come to terms with pretty well. All right. Do you have further questions? Other questions? Okay, then thank you very much for your time. I appreciate it. Let me say one thing on the hack and talk about Brady. If you look at 5602D, it offers two options, but either option would require the court to adjudicate by looking at facts, and the rule very clearly requires testimony, information, a hearing, or if the court dispenses with a hearing, a written opinion, none of which occurred in 6502D. I was just thinking about asking Ms. Whitman this, but it seems like maybe there's just a problem with the state court rules. If the Wayne County Conviction Integrity Unit, which is part of the prosecutor's office, is routinely entering into these, I would assume that the state courts are aware that this is happening. On the other hand, you represent the city of Detroit often. I understand you're representing Mr. Jimenez right now in his individual capacity, but, you know, you do a lot of these 1983 claims. You do a lot of these 1983 claims. Is this just a case that you need to open in an administrative manner and go to the Michigan Supreme Court and say, what do you want the rules to be? I understand you— I guess what I would say— You would say, no, we should say the state court judgment is invalid. Well, I think it is invalid, and I think what is happening is astonishing, and what is happening is that what I would consider a renegade prosecutor is engaging in this not with all judges. I mean, you asked the question, it's not in the record, but my understanding is those in this unit will say, well, we don't do this with this judge because this judge knows the rule has to have X and Y and Z, but we do it with these judges who will sign, and that's how we do it because they have in mind an outcome they want to get to. I don't like criticizing other lawyers, but that's what's happening here. You can't be really asking us as a federal appellate court to get involved in what the state's internal procedures are, are you? I understand the context, and I do understand the court's concerns. I've done my best to try to chart a path for you that I think addresses those concerns, but if the court doesn't want to go there, let me just say with respect to the qualified immunity that although given the opportunity this morning and certainly having lots of opportunity in the briefing, sister counsel has not identified a single decision from this circuit or the U.S. Supreme Court that squarely holds that uncorroborated tips and rumors are Brady Giglio material, and there has been very limited discussion in the brief and pretty much none at oral argument which point out or try to explain how any of this would have been impeaching. The prosecutor's theory was not this was a random crime. The prosecutor's theory was I don't have to prove motive under Michigan law, and I'm not going to. I have two eyewitnesses who multiple times identified this guy as the shooter, and that was the basis of the trial. The fact that Sandoval may have ordered a hit and Ansari may have been the hit man is not exculpatory. It's incriminating, which the district court recognized in its initial decision. I think it's also true that Jimenez said when he heard the name Sandoval and he understood the altercations that happened shortly before this shooting, he Googled Sandoval. So the idea that somehow because these cell phones weren't turned over, the cell phone information or some of the information, that the defense attorney couldn't have pursued this as a defense, couldn't have found the information in more detail on his own, just won't wash because Jimenez learned all about his extensive drug dealing and everything else he testified in this record by Googling Sandoval, and that was the information on Wikipedia or wherever the Google took him to. Wikipedia wasn't going to tell you where Sandoval's car was located on the particular date. I'm glad you're asking that because let me address that. Livernois, and I don't know how often any of you have been in that part of Detroit, but I grew up in that part of Detroit, and I'm well familiar with Livernois. It's a major thoroughfare that people use going back and forth for a huge area, and what's very clear is there's nothing in that that showed that Sandoval got off of Livernois, was on this block, drove around in the area, was parked somewhere. He passed through on a major thoroughfare that was in that general area. If this information had been presented during the criminal trial or pursued in any way, which the criminal trial lawyer chose not to do, it likely would have been excluded because there wasn't any connection with Ansari. And so the idea that now Jimenez is going to be on the hook for $10 million plus whatever the interest is, based on information that could never have exculpated Ansari and likely would not have been admitted at trial is just contrary to all of this court's precedent. And on that basis, we request the court to reverse. With respect to the new trial, we stand on the arguments in the brief. All right. Thank you. Thank you. Thank you both for helpful arguments in this tricky case, and the case will be submitted.